UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| E. S., a minor, by and through D.K, her mother and next friend, and J.S., her father and next friend;<br><br>Plaintiff,<br><br>vs.<br><br>BROOKINGS SCHOOL DISTRICT, ROGER DEGROOT, former Superintendent of Schools, in his Official and Individual Capacities, and PAUL VON FISCHER, High School Principal, in his Official and Individual Capacities;<br><br>Defendants. | **4:16-CV-04154-KES**<br><br><br><br>**ORDER DENYING BOTH MOTIONS FOR SUMMARY JUDGMENT** |

Plaintiff, E.S., by and through her parents D.K. and J.S. initiated this action against defendants the Brookings School District (District), Roger Degroot, and Paul Von Fischer. Docket 1. E.S. alleges that defendants violated her due process rights under the United States Constitution. *Id.* Both plaintiffs and defendants move for summary judgment. Docket 15; Docket 19.

## FACTUAL BACKGROUND

The undisputed facts[1] are:

---

[1] The undisputed facts are derived from the parties' submitted briefs, attachments, and the portions of the statements of undisputed material facts

During the 2012-2013 academic year, E.S. attended Mickelson Middle School (MMS) in Brookings, South Dakota as an eighth grader. Docket 17 ¶ 1. At MMS, E.S. was enrolled in a math class taught by Ms. Renkly. *Id.* ¶ 2. E.S. did not like Ms. Renkly, and at one point, E.S. wrote a vulgar message on Ms. Renkly's classroom whiteboard. *Id.* ¶¶ 3, 4. E.S. received a three-day in school suspension (ISS) as punishment for writing the vulgar message on Ms. Renkly's whiteboard. *Id.* ¶ 5. MMS's vice principal and principal notified D.K., E.S.'s mother, about the ISS. *Id.* ¶ 6.

In January of 2013, E.S. texted a classmate about Ms. Renkly and in one message stated that she would laugh while Ms. Renkly took her last breath and she discussed a school shooting. Docket 18-3 at 1. On another occasion, E.S. placed "dead baby jokes" on Ms. Renkly's desk. Docket 17 ¶ 7. On February 1, 2013, Ms. Renkly found a piece of paper at MMS where E.S. had printed three pictures of Ms. Renkly drinking alcohol and stated that Ms. Renkly should make her Facebook profile private so that pictures of her did not fall into the wrong hands. *Id.* ¶¶ 11, 12. As a result of the conduct toward Ms. Renkly, MMS suspended E.S. for ten days. *Id.* ¶ 13. Instead of returning to MMS, E.S. completed the remainder of the 2012-2013 school year in the Sioux Falls School District. *Id.* ¶ 17; Docket 29 ¶ 17.

In fall of 2013, E.S. returned to Brookings and enrolled at Brookings High School (BHS) as a freshman. Docket 17 ¶ 19. After a few days of attending

that are either not disputed or not subject to genuine dispute. Where the facts are disputed, both parties' averments are included.

high school, BHS's on-duty police officer, Officer Fishbaugher,[2] told E.S. that she could not attend class at BHS and sent her home. *Id.* ¶ 20; Docket 16 at 3. E.S. was not permitted at school for approximately a week. Docket ¶ 22. There is little information in the record as to what transpired prior to E.S.'s removal, and it is unclear what the exact dates are that E.S. was out of school. After E.S. had been removed from school for a week, J.S., E.S.'s father, and Principal Von Fischer[3] had a meeting where Von Fischer recommended that E.S. attend classes at the Alternative Learning Center (ALC) located at BHS. Docket 17 ¶ 22; Docket 18-1 at 8; Docket 26-1 at 4. There is no indication in the record as to whether or not E.S. attended the meeting. J.S. and D.K. did not contest the decision to place E.S. at ALC with the understanding that, if E.S. performed well at ALC, she could return to regular classes at BHS. Docket 29 ¶¶ 22, 23. J.S. and D.K. testified that they did not feel that they had a choice in whether or not E.S. was placed in the ALC. Docket 29 ¶ 23. On September 3, 2013, E.S. began attending classes at the Alternative Learning Center (ALC) at BHS. Docket 17 ¶ 23.

In late October 2013, E.S.'s ALC teacher, Mrs. Bothun, reported to school officials that E.S. made comments that she interpreted as threatening.

---

[2] The complaint states that Von Fischer told E.S. she had to leave the school. Docket 1 ¶ 9.

[3] It is unclear from the record exactly who was at this meeting. Both parties agree that Von Fischer was in attendance. *See* Docket 17 ¶ 22; Docket 29 ¶ 23. And according to D.K.'s deposition, J.S. was in attendance at the meeting but D.K. did not attend. Docket 26-1 at 4. But there is no other evidence in the record indicating whether or not any other school officials attended the meeting or whether E.S. attended the meeting.

Docket 17 ¶ 26; Docket 29 ¶ 26. As a result of Mrs. Bothun's report, E.S. was removed from the ALC on October 31, 2013. Docket 17 ¶¶ 26, 28. On or about November 1, 2013, various school officials[4] and J.S. met and discussed E.S.'s removal from the ALC. *See* Docket 27-1 at 10-11. The parties agreed that Dr. John Sivesind would conduct a psychological evaluation of E.S. before she was permitted to return to school. *Id.* ¶ 30; Docket 29 ¶ 30. There is no indication in the record as to whether E.S. was present at this meeting, whether E.S. or her parents were informed of what the charges against her were, or whether E.S. was permitted to tell her side of the story.[5] Dr. Sivesind concluded that E.S. suffered from "some well-defined and undiagnosed pathology," and recommended that E.S. return to school. Docket 17 ¶ 31. On December 4, 2013, BHS school officials, D.K., and J.S. had another meeting and the school officials requested another evaluation. *Id.* ¶ 34; Docket 29 ¶ 34.

From October 31, 2013, until December 4, 2013, E.S. was enrolled in one[6] online course. Docket 17 ¶ 36; Docket 29 ¶ 39. At the December 4, 2013

---

[4] Again, it is not clear who attended this meeting. Both parties agree that E.S.'s father, J.S., was at the meeting. Docket 17 ¶ 29; Docket 26-1 at 6. D.K. testified at her deposition that she was not at the meeting. Docket 26-1 at 6. But an email sent from D.K. to Von Fischer on November 1, 2013, indicates that D.K. attended the meeting. *See* Docket 27-1 at 10. Neither party identifies which schools officials were at the meeting and neither party addresses whether or not E.S. was at the meeting.

[5] E.S. and her parents maintain that E.S.'s comment to Mrs. Bothun was not intended to be threatening and instead there was just a misunderstanding between E.S. and Mrs. Bothun. Docket 29 ¶ 26.

[6] Based on emails exchanged between D.K. and Von Fischer, it appears that the one class E.S. took during this time was Geography. *See* Docket 27-1 at 9-11.

meeting, D.K. requested that E.S. be enrolled in more online courses. Docket 27-2 at 7. On December 9, 2013, D.K. emailed Von Fischer stating that BHS enrolled E.S. in an online English class shortly after the December 4 meeting, but that she still had not been enrolled in an online Algebra or Science class. Docket 27-1 at 9. On December 10, 2013, D.K. sent another email to Von Fischer stating that E.S. had started a Science class but was still unable to begin Algebra. *Id.* at 8. In and around December 13, 2013, E.S. was enrolled in an online Algebra class. *Id.* at 7.

As a result of the December 4, 2013 meeting, Dr. Scott Pribyl reviewed Dr. Sivesind's report and recommended that E.S. "participate in a more in-depth psychological evaluation and risk-assessment." Docket 17 ¶ 33. On January 14, 2014, school officials, including Roger Degroot, the Superintendent of the Brookings School District, met with J.S. and D.K. *Id.* ¶ 34. At the January meeting, the school officials indicated that they wanted E.S. to be evaluated again. *Id.* ¶ 35. E.S. was then evaluated by Dr. Jennifer Helkenn at Sioux Falls Psychological Services. Docket 29 ¶ 35. Also in January 2014, the District provided E.S. with a tutor. *Id.* From January 2014 until the end of the 2014 school year, E.S. received online and tutor-aided instruction. Docket 17 ¶ 38. On May 16, 2014, E.S. was found to be eligible for special education services. *Id.* ¶ 40.

On June 14, 2014, J.S., D.K., Von Fischer, Michelle Powers (Director of Special Education), and DeGroot met to discuss E.S.'s education. *Id.* ¶ 41. At the meeting, DeGroot stated that E.S. would not be allowed on school property

until she was evaluated by Dr. Kauffman. *Id.* ¶ 42. On August 22, 2014, Von Fischer sent a letter to D.K. and J.S. stating that "[E.S.] will remain an enrolled student receiving online courses and support from a tutor indefinitely. This decision is based on initial information received from Dr. Kauffman . . . ." Docket 27-7. Dr. Kauffman's final report was completed sometime in mid-October 2014. Docket 27-13. On August 24, 2014, E.S. filed a student grievance form requesting a hearing in front of the School Board or an impartial hearing officer. Docket 27-6. E.S. was later informed that her grievance would have to be presented first to Von Fischer. Docket 17 ¶ 44. E.S. and her parents felt that they had already met with Von Fischer on multiple occasions and declined to meet with him again. *Id.* ¶ 45; Docket 29 ¶ 45. From August 2014 until January of 2015, E.S. was enrolled in online classes and received tutoring. Docket 17 ¶ 38.

In January of 2015, based on a finding of the District, E.S. became eligible for and began receiving special education services at Volunteers of America in Sioux Falls, South Dakota. *Id.* ¶ 47. E.S. completed the program with Volunteers of America on April 15, 2015. *Id.* ¶ 49. For the remainder of the school year, E.S. attended BHS for half-days and then had online classes for the remaining half of the day. *Id.* ¶¶ 50-51. E.S. completed her Junior and Senior years at Lincoln High School in Sioux Falls, South Dakota. *Id.* ¶ 52. E.S. graduated from Lincoln High School in 2017. *Id.* ¶ 53.

# STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must inform the court of the basis for its motion and also identify the portion of the record that shows there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992) (quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). On a motion for summary judgment, the facts and inferences drawn from those facts are "viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

**DISCUSSION**

Under the Fourteenth Amendment, a state may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). In *Goss v. Lopez*, 419 U.S. 565 (1975), the United States Supreme Court recognized that "a student's legitimate entitlement to a public education [is] a property interest . . . protected by the Due Process Clause . . . ." *Id.* at 574. Thus, "[a]t the very minimum . . . students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing." *Id.* at 579. In the case of a short suspension, not exceeding 10 days, the Supreme Court has held that a student must be informed of the alleged misconduct and given the opportunity to respond to the allegation. *Id.* at 582. But "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id.* at 584.

I.    **E.S. was subjected to a deprivation of education similar to that of a suspension.**

There are two separate time frames when defendants prohibited E.S. from attending school on BHS's school grounds—for a week at the beginning of the 2013 school year and for 15 months starting on October 31, 2013. Defendants argue that E.S. was not entitled to procedural due process because she was not suspended or expelled from school in August 2013 or in October

8

2013, but she was instead put in an alternative learning environment where she received instruction online and with a tutor. Docket 16 at 9. The Eighth Circuit Court of Appeals has not addressed whether a student's placement in an alternative school for disciplinary reasons implicates a constitutional violation. *Chyma v. Tama Cty. Sch. Bd.*, 2008 WL 4552942 at *3 (N.D. Iowa Oct. 8, 2008). But several other circuits have found that a student may not have procedural due process rights where "the sanction imposed is attendance at an alternative school absent some showing that the education received at the alternative school is significantly different from or inferior to that received at [her] regular public school." *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1359 (6th Cir. 1996); *see also Langley v. Monroe Cty. Sch. Dist.*, 264 F. App'x. 366, 368 (5th Cir. 2008); *C.B. v. Driscoll*, 82 F.3d 383, 389 (11th Cir. 1996); *Zamora v. Pomeroy*, 639 F.2d 662, 670 (10th Cir. 1981).

### A. E.S. was suspended from BHS for a week at the beginning of the 2013 school year.

Neither party disputes that E.S. was prohibited from attending school for a week at the beginning of the 2013 school year. Both the plaintiffs and the defendants acknowledge that E.S. attended school for a few days before she was spotted by Officer Fishbaugher and told that she could not attend classes at BHS. *See* Docket 17 ¶ 20; Docket 29 ¶ 20. E.S. was then prohibited from attending school for a week. *See* Docket 17 ¶ 22. Defendants do not offer any explanation as to E.S.'s removal at that time. To the extent that defendants try to argue that she was not suspended and only placed in an alternative school,

that argument fails. E.S. was prohibited from attending regular classes at BHS and was not provided a tutor or other instruction during that time. Her schooling during that week was "significantly different" from what she would have received attending BHS. Thus, she was effectively suspended and entitled to the due process procedures described in *Goss* for a short-term suspension.

### B. E.S. was suspended from October 31, 2013, until December 13, 2013.

Defendants argue that "[i]t is undisputed that, beginning in November 2013, E.S. was enrolled in at least one online course and she eventually received aid from a school-appointed tutor" so her alternative form of education was not inferior to a regular public school. Docket 16 at 9-10.  E.S. did *eventually* receive instruction in her regular classes and instruction from a tutor, but there was a six-week period of time where E.S. was only enrolled in one online course. In *Marner ex rel. Marner v. Eufaula City School Board*, 204 F. Supp. 2d 1318 (M.D. Ala. 2002), a student was suspended for three days and placed in an alternative school for forty-five days after a pocket knife and exacto blade were found in his car. *Id.* at 1321. Prior to the suspension, the student received oral notice of the charges against him and the student agreed that oral or written notice was all that was due prior to a suspension of fewer than ten days. *Id.* at 1323. But the student argued that his placement in an alternative school setting was equivalent to a suspension, and thus, he was suspended for forty-eight days and was entitled to a full hearing before the school board. *Id.* The district court reasoned that the alternative school was not

inferior to regular classroom instruction because the student was permitted to work on his regular school work, was graded as if he were in the regular classroom, received one-on-one contact from certified teachers, and could receive assistance from the regular classroom teachers. *Id.* at 1324. Thus, the court found that reassignment to the alternative school "would not have resulted in a sufficient educational deprivation to warrant treating the reassignment to the alternative school as the equivalent of a suspension" so the student was not entitled to due process. *Id.*

In *Nevares v. San Marcos Consolidated Independent School District*, 111 F.3d 25, 26 (5th Cir. 1997), a student was transferred to an alternative education program as a form of discipline and to maintain safety after the student committed an aggravated assault. The Fifth Circuit Court of Appeals reasoned that the student was not denied access to public education because "[h]e was only to be transferred from one school program to another program with stricter discipline." *Id.* The alternative program was maintained by Texas schools and required to comply with a set of statutory regulations. *Id.* (citing Tex. Educ. Code §§ 37.001—37.011 (stating the rules and regulations for "Alternative Settings for Behavior Management")). Thus, the Fifth Circuit found that the transfer to the alternative education program was not equivalent to a suspension or expulsion and did not trigger due process rights. *Id.*

In *Swindle v. Livingston Parish School Board*, 655 F.3d 386 (5th Cir. 2011), a school expelled a student for a year (eighth grade) after the student was discovered to have attended a school dance under the influence of

11

marijuana. *Id.* at 389. The student's parents requested that the school provide some form of alternative education during that year, but the school refused the request without due process. *Id.* at 390. Instead the student's parents attempted to home school her during eighth grade and when the student came back to school she was required to repeat the eighth grade. *Id.* at 390-91. The Fifth Circuit Court of Appeals found that the student "was entitled to pre-deprivation notice and some kind of hearing" prior to the termination of her right to alternative education that caused her to lose her right to education for an entire school year. *Id.* at 393.

Here, from October 31, 2013, until December 4, 2013, E.S. received an alternative form of education that included one online Geography class. She was not enrolled in Science, Algebra, or English until December 13, 2013, and she did not receive any tutoring until mid-January of 2014. In contrast to the students in *Marner* and *Nevares* where the students continued completing work in their regular classes and received instruction from certified teachers, beginning on October 31, 2013, until December 4, 2013, E.S. was only enrolled in one class. E.S. was not enrolled in all of her regular classes until December 13, 2013, so E.S. went approximately six weeks without the ability to continue completing work in her regular classes. Thus, E.S.'s alternative education during that timeframe was equivalent to a suspension and triggered a right to procedural due process.

Defendants argue that plaintiffs were required to obtain data or expert testimony to demonstrate that E.S.'s instruction was inferior to that of a

regular public school and cites to the Sixth Circuit Court of Appeals opinion in *Kenton County School District v. Hunt*, 384 F.3d 269 (6th Cir. 2004). But the opinion in *Hunt* is distinguishable from this situation because *Hunt* dealt with violations of the Individuals with Disabilities Education Act (IDEA) and not with violations of the Due Process Clause. *Id.* at 271. The Sixth Circuit interpreted provisions of the IDEA as requiring expert testimony and data to determine whether a school district has complied with the act, but that requirement was limited to compliance with the IDEA.[7] Thus, plaintiffs are not required to provide expert testimony as to the inadequacy of E.S.'s education, and this court finds that E.S. has presented sufficient evidence to determine that one online class for a six-week period "is significantly different from or inferior to that received at [E.S.'s] regular public school" because she was not assigned work in her regular classes and did not receive any instruction from a certified teacher. *Buchanan*, 99 F.3d at 1359. Her deprivation of an education was significant enough to be treated as a suspension and warrants procedural due process.

### C. There is a question of fact as to whether E.S. was suspended from December 13, 2013 through January of 2015.

Plaintiffs also argue that E.S. was constructively suspended and deprived of an education when she participated in only online classes and tutoring at

---

[7] The Sixth Circuit in *Cordrey v. Euckert*, 917 F.2d 1460, 1470 (6th Cir. 1990), found that the IDEA required that the student has the burden to show that he needs extended school year (ESY) education and that expert testimony and/or empirical data is required to show such a need.

home. When a student is placed in an alternative learning program for disciplinary reasons, there must be a showing that the alternative school is "significantly different from or inferior to that received at [her] regular public school" for the student to claim that she is entitled to due process. *Buchanan*, 99 F.3d at 1359. In *Marner* and *Nevares*, the courts found that the alternative learning programs were not inferior to a regular classroom setting because the students received instruction from certified teachers, had one-on-one contact with teachers, and were able to work on their regular schoolwork. *See Marner*, 204 F. Supp. 2d at 1324; *Nevares*, 111 F.3d at 26.

Neither the defendants nor the plaintiffs provide significant evidence as to the quality of E.S.'s online instruction and tutor. D.K. testified that E.S. fell "well behind her other peers," that she did not receive "a full education from the Brookings School District," and "had to take classes into the summer in order to just complete her freshman year on time." Docket 27-2 at 7. Defendants do not identify whether E.S.'s tutor was a certified teacher, whether E.S. had sufficient access to the tutor to ask questions and receive adequate instruction, and whether E.S. was able to work on her regular schoolwork. Defendants also do not provide any information as to whether E.S. was able to maintain a similar pace of learning as her peers. Thus, this court finds that there is a question of material fact as to whether E.S.'s online instruction and tutor were inferior to a regular classroom setting such that would require due process.

## II. Process due to E.S. prior to her placement in an alternative education program.

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* The Supreme Court's opinion in *Goss* only dealt with the required procedural safeguards for short-term suspensions—ten days or less, and the Eighth Circuit recognized that the holding in *Goss* is limited to shorter suspensions. *Doe ex rel. Doe v. Todd Cty. Sch. Dist.*, 625 F.3d 459, 462-63 (8th Cir. 2010). The United States Supreme Court has not addressed what procedural safeguards apply to students subjected to long-term suspensions, but the Eighth Circuit, as well as several other appellate courts, have applied the balancing test set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Keefe v. Adams*, 840 F.3d 523, 535 (8th Cir. 2016); *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001); *Palmer v. Merluzzi*, 868 F.2d 90, 95 (3d Cir. 1989); *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 923-24 (6th Cir. 1988); *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 14 (1st Cir. 1988); *Nash v. Auburn Univ.*, 812 F.2d 655, 660 (11th Cir. 1987).

Under the balancing test in *Mathews*, the court must balance three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's

interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335. E.S. alleges that she was not provided proper notice or an opportunity to defend against the charges levied against her prior to being constructively suspended from school first for one week in August 2013 and then again beginning in October 2013 and continuing until January of 2015.

**A. There are material disputes of fact as to whether E.S. was provided with notice and an opportunity to respond when she was suspended from school for one week.**

E.S.'s suspension at the beginning of the 2013-2014 school year falls under the procedural requirements set out in *Goss* because it was a short-term suspension. The Supreme Court in *Goss* held that in the case of a short suspension a student must be informed of the alleged misconduct and given the opportunity to respond to the allegation. *Goss*, 419 U.S. at 582. Here, defendants do not identify anywhere in the record what E.S.'s alleged misconduct was or whether Officer Fishbaugher informed E.S. of her alleged misconduct and gave her an opportunity to respond. Defendants simply state that Officer Fishbaugher told E.S. "she could not attend regular class at BHS." Docket 17 ¶ 20. Plaintiffs allege that E.S. did not engage in any misconduct to warrant the suspension. Docket 29 ¶ 20. Thus, there are disputes of material fact as to whether E.S. was provided notice and an opportunity to be heard or whether she was simply suspended from school without any due process until BHS officials could decide how to handle her enrollment.

**B. There are material disputes of fact as to whether E.S. received due process prior to her six-week suspension and her enrollment into online courses and tutoring.**

Defendants argue that they provided E.S. with notice and an opportunity to be heard when they met with E.S.'s parents. Docket 16 at 18. E.S.'s six-week suspension is a long term suspension entitled to due process as set out in *Mathews*. *Goss*, 419 U.S. at 584; *Keefe*, 840 F.3d at 535. In *Keefe*, a student was removed from the nursing program at Central Lakes College (CLC) for making unprofessional Facebook comments. *Keefe*, 840 F.3d at 526-27. Prior to being removed from the program, the Director of Nursing at CLC and the CLC's Dean of Students met with the student to discuss his unprofessional posts. *Id.* at 526. At the meeting, the Director reviewed the steps of the due process policy in the student handbook, informed the student that "his Facebook posts raised concerns about his professionalism and boundary issues[,]" and "she read aloud portions of the posts that she considered most significant." *Id.* The director then gave the student an opportunity to respond, informed the student that he was removed from the nursing program, and informed him that he could appeal the decision. *Id.* at 527. The Eighth Circuit found that the student was awarded sufficient procedural due process under *Mathews* because the director "met with [the student], informed him that there were concerns regarding his Facebook, read from the posts of greatest concern, explained that his posts implicated the professionalism and professional boundary requirements of the Nursing Program, and gave him an opportunity

to respond." *Id.* at 535. The Eighth Circuit also noted that the student admitted to authoring the posts. *Id.*

In *Waln ex rel. Waln v. Todd County School District*, a student was given a short-term suspension after getting into a physical fight with another student and was suspended on the same day by the school's principal. *Waln*, 388 F. Supp. 2d 994, 996-97 (D.S.D. 2005). The day after the suspension and fight, the school's principal was able to reach the student's mother on the phone and informed her that her son had been in a fight and was suspended. *Id.* at 997. The principal also told the student's mother that her son may receive a long-term suspension or expulsion from school. *Id.* Two days after the physical altercation, the school principal sent a letter to the student's mother stating that he was suspending the student for the remainder[8] of the school year and "[the] letter made no mention of a hearing or other procedures that could be employed to challenge the suspension." *Id.* at 998. A few days later, the student's stepfather informed the school that they objected to the suspension and requested a hearing with the School Board. *Id.* At the hearing, the school's superintendent detailed the allegations against the student including accounts of the fight. *Id.* at 999. The student and his parents were permitted to respond. *Id.* The school board referred the decision of whether to overturn the

---

[8] The letter was authored on January 15, 2004. *Waln*, 388 F. Supp. 2d at 997. Thus, the suspension was several months long and considered a long-term suspension.

suspension to the superintendent who eventually overturned the decision after the student was suspended for a total of 31 school days. *Id.* at 1000.

The district court found that the student in *Waln* was not afforded procedural due process. *Id.* at 1007. The court reasoned that "[a]t a very minimum, it was incumbent on the defendants to inform [the student] that he had the right to challenge the suspension in some sort of an adjudicatory hearing." *Id.* at 1003. And the superintendent imposed a long-term suspension two days after the fight without any sort of "meaningful opportunity to deny the aggravated assault charge or present his side of the story." *Id.* at 1004. The court also noted that the school failed to comply with the procedures set out in South Dakota law but acknowledged that violations of state law, without more, do not arise to a violation of due process. *Id.* at 1007.

Here, there is little evidence in the record to determine whether or not E.S. was afforded sufficient due process. As to the November 1, 2013 meeting, the parties are only able to identify that J.S. was in attendance, and based on emails exchanged between Von Fischer and D.K., it appears that Von Fischer and D.K. also attended. Docket 27-1 at 10. But the record does not indicate whether E.S. was at the meeting, whether E.S. or her parents were informed of her wrongful actions, or whether E.S. had an opportunity to present her side of the story. Thus, there are disputes of material fact as to whether E.S. was afforded due process when she was constructively suspended from BHS for six weeks.

Beginning on December 13, 2013, the District enrolled E.S. in online courses and then provided a tutor starting in January of 2014. E.S. received online instruction and tutoring until January 15, 2015. As discussed above, there is a question of fact as to whether the online courses and tutor were inferior to a regular classroom setting. *See supra* Section I.C. If the online instruction and tutoring were inferior, then E.S. would have been entitled to due process as set out in *Mathews. Goss*, 419 U.S. at 584; *Keefe*, 840 F.3d at 535.

Defendants argue that they provided E.S. with notice and an opportunity to be heard when they met with E.S.'s parents. On December 4, 2013, BHS school officials, D.K., and J.S. had another meeting where the school officials requested that E.S. be evaluated by another doctor and indicated that E.S. would not be permitted to return to school. Docket 17 ¶ 34; Docket 29 ¶ 34. At the December 4, 2013 meeting D.K requested that, if E.S. were to remain taking online classes, she be enrolled in more than one class. Docket 27-2 at 7. D.K. testified that she did not feel she had a choice as to whether E.S. would receive online courses or regular classroom instruction. Docket 18-1 at 11. There is no indication in the record whether E.S. or her parents were informed of her wrongful actions or whether E.S. had an opportunity to present her side of the story. Docket 17 ¶¶ 32-33. School officials had another meeting in January of 2014 where they asked for another evaluation, but again there is not enough information in the record to determine whether E.S. received due process as required in *Mathews.* Thus, there is a material dispute of fact as to

20

whether E.S. received due process prior to her placement in online courses and tutoring.

### 1. There was not a process made available to E.S.

Defendants also argue that E.S. cannot establish a claim for violation of due process because she did not utilize the processes available to her. Docket 16 at 18. On August 24, 2014, E.S. filed a student grievance form requesting a hearing in front of the School Board or an impartial hearing officer, but upon learning that the first step would be to meet with Von Fischer, E.S. and her parents declined to meet with Von Fischer again. Docket 17 ¶ 44; Docket 27-6.

Defendants rely on *Alvin v. Suzuki*, 227 F.3d 107 (3d Cir. 2000), to support their argument. In *Alvin*, a professor at the University of Pittsburgh filed a § 1983 action alleging he was deprived of his ability to conduct research projects without receiving due process. *Id.* at 112. The University had a faculty grievance process, but the professor claimed he was denied access to it. *Id.* at 112-13. The Third Circuit found that the professor had not followed the procedures laid out in the faculty grievance process and that "[i]f there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Id.* at 116.

The Brookings School District has policies in place to govern the suspension of students. As to short-term suspensions, "the Principal or Superintendent shall give oral or written notice to the student as soon as possible . . . stating the facts that form the basis for the suspension." Docket

27-3 at 5. "The student must be given the opportunity to answer for the charges." *Id.* "If the student is suspended, The Principal or Superintendent shall give the parent/guardian oral notice . . . or shall send the parent/guardian . . . a written notice[.]" *Id.* at 5-6. "There are no further hearing rights when a short-term suspension is utilized." *Id.* at 6.

As to long-term suspension, the Superintendent must file a written report with the school board that includes the relevant facts and the Superintendent's decision or recommendation. *Id.* The Superintendent must also send a copy of the report to the student's parent or guardian, and the report must explain that the parents have the right to request a hearing. *Id.* at 7. The waiver must be in writing to the Superintendent. *Id.* The school board must approve the Superintendent's recommendation before it is implemented. *Id.*

There is no evidence in the record that defendants mailed a written report to E.S.'s parents or filed one with the school board prior to removing her from school. To succeed on a claim for violation of due process, the plaintiff must first take advantage of the processes available. But unlike in *Alvin*, the defendants never made its process available to E.S. because they never "officially" suspended her. Defendants argue that E.S.'s failure to meet with Von Fischer about her student grievance constitutes a failure to avail herself of the processes provided. But a student grievance is not part of the procedure set out in the District's own policy for suspensions. Thus, E.S. did not fail to follow

procedures available to her for suspensions because they were not ever made available to her.

### 2. IDEA

Defendants argue that this claim is not properly brought under § 1983, and instead, it should have been brought under IDEA because E.S. was determined to be a student with special needs and was placed in alternative learning settings. Docket 16 at 20. IDEA seeks "to ensure that all children with disabilities have available to them a free appropriate public education . . . ." 20 U.S.C. § 1400(d)(1)(A). E.S., however, was not found eligible for special education services until May 16, 2014. Docket 17 ¶ 40. Thus, the issues regarding her quality of education in September 2013 and from October 31, 2013 until May 16, 2014, would not be governed by IDEA.

As to plaintiffs' claims from May 16, 2014 until January of 2015, plaintiffs have not alleged that E.S. was not afforded a free appropriate public education (FAPE) under IDEA. E.S. was enrolled in special education services at Volunteers of America in Sioux Falls, South Dakota in January of 2015. Docket 17 ¶ 47. Plaintiffs have specifically stated that they are not contesting the quality of education provided at Volunteers of America and did not bring a claim for violation of IDEA. Docket 28 at 14-15. E.S. was originally placed in online courses as a disciplinary measure and not as a response to her eligibility for special education. Plaintiffs' allegations are that E.S. was effectively suspended from school without proper due process. Thus, any exhaustion

requirements under IDEA are inapplicable because plaintiff is not alleging violations of IDEA.

## CONCLUSION

In conclusion, the alternative education that E.S. received for approximately a week in September 2013 and from October 31, 2013 through December 13, 2013, was inferior to what she would have received attending regular classes, so each time period was equivalent to a suspension and required due process. There is a material dispute of fact as to whether E.S.'s education from December 13, 2013 until January of 2015 was inferior to what she would have received attending regular classes and thus whether she was entitled to due process. There are also material disputes of fact as to what process E.S. was afforded prior to her suspensions and her placement in online courses and tutoring. Thus, it is

ORDERED that defendants' motion for summary judgment (Docket 15) is DENIED.

It is FURTHER ORDERED that plaintiffs' motion for summary judgment (Docket 19) is DENIED.

DATED May 23, 2018.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE